IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

A&L INDUSTRIES, LLC,

                    Plaintiff,

    v.

WEAVER ENTERPRISES, LTD.,

                    Defendant,

and OAK LEAF OUTDOORS, INC.,

                    Defendant and Counter-Plaintiff,

    v.

A&L INDUSTRIES, LLC and ANDRAE D'ACQUISTO,

                    Counter-Defendants.

OPINION and ORDER

20-cv-552-slc

---

      This civil action involves numerous disputes about the parties' use of the LONE WOLF®
trademark, which is the subject of a 2006 license agreement between the parties, and two
unlicensed marks (a wolf head logo and the name Alpha) in connection with the manufacture,
sales, advertising, and promotion of hunting tree stands, clothing, and accessories.  Plaintiff A&L
Industries, LLC filed this lawsuit against defendant Weaver Enterprises, Ltd. and its successor-in-
interest, defendant Oak Leaf Outdoors, Inc., for trademark infringement, unfair competition,
and false designation of origin under the Lanham Trademark Act, 15 U.S.C. §§ 1114(1) and
1125(a), and Wisconsin common law, and breach of contract under Wisconsin law.  Dkt. 1.
A&L contends that after its owner, counter-defendant Andrae D'Acquisto, terminated the
parties' long-standing license agreement on October 15, 2018, defendants used the LONE
WOLF® trademark as well as the wolf head logo and Alpha name without permission and in
violation of the license agreement.  Oak Leaf also asserts counterclaims against A&L and
D'Acquisto for trademark infringement, unfair competition, breach of contract, and violation

of the Illinois Franchise Disclosure Act, based in large part on its contention that the license

agreement was not terminated legally.  Dkt. 38 (amended answer and counterclaims).  Before

the court are the parties' cross motions for summary judgment.  Dkts. 43 and 50.

For the reasons explained below, I am granting A&L/D'Acquisto's motion for summary

judgment and denying Oak Leaf/Weaver Enterprises's motion with respect to:

> (1) A&L/D'Acquisto's three trademark claims (Counts I-III) and
> its breach of contract claim (Count IV) regarding Oak Leaf's
> use of the LONE WOLF® mark after the termination of the
> license agreement on October 15, 2018; and

> (2) Oak Leaf's trademark, breach of contract, and IFDA
> counterclaims.

I am denying A&L/D'Acquisto's motion for summary judgment and granting Oak Leaf/Weaver

Enterprises's motion with respect to:

> (1) A&L's trademark claims related to the wolf head logo and
> Alpha name; and

> (2) A&L's claims against defendant Weaver Enterprises.

Therefore, this case will proceed to trial solely on the issue of damages with respect to A&L's

trademark and breach of contract claims regarding Oak Leaf's use of the LONE WOLF® mark

after the termination of the license agreement on October 15, 2018.  Weaver Enterprises will

be dismissed as a defendant and D'Acquisto will be dismissed as a counter-defendant.

The following facts are undisputed except where noted.

## UNDISPUTED FACTS

### I.  The Contested Marks

Counter-defendant Andrae D'Acquisto is the former president and owner of Lone Wolf Manufacturing Company, Inc.  In 1984, Lone Wolf Manufacturing began manufacturing and selling tree stands, which are elevated platforms mounted to a tree for hunters to stand or sit on while hunting.

In 2003, the United States Patent and Trademark Office (USPTO) granted D'Acquisto trademark registration in the LONE WOLF® name (No. 2,733,871) for use on t-shirts and caps and hunting equipment, including tree stands, climbing sticks, tree stand pads, tree stand cords, bow holders, tow ropes, tree stand belts, tree stand cables, tree stand blinds, climbing stick brackets, climbing stick fasteners, climbing stick steps, and climbing stick straps.  *See* dkt. 1-1 (registration).  These items were to be sold exclusively on the internet and through trade shows. D'Acquisto has designed, created, and patented platforms for tree stands that have been sold under the LONE WOLF® name.

Prior to 2006, D'Acquisto also used various names, terms, symbols, emblems, slogans, designs, colors and other identifying marks—including a wolf's head— in connection with the sale of many types of hunting-related goods, instructional hunting DVDs, and clothing.  He also introduced "Alpha" model tree stands, hand climber combos, sit and climb combos, and hang on stands.  D'Acquisto does not identify these additional marks with any specificity, but he has provided the following example of what he calls a "Lone Wolf with head" mark depicted on what appears to be one of his DVDs:



## II.  2006 Licensing of LONE WOLF® Trademark

On June 9th, 2006, D'Acquisto executed a series of six agreements—one each for asset purchase, consulting, interim production, noncompete, technology assignment, and license — by which D'Acquisto sold Lone Wolf Manufacturing and licensed the LONE WOLF® trademark (Reg. No. 2,733,871) to defendant and counter-plaintiff Weaver Enterprises, Ltd., a Nevada corporation with its principal place of business in Brimfield, Illinois.

Less than a month later, Weaver Enterprises assigned all of its rights under these six agreements to defendant and counter-plaintiff Oak Leaf Outdoors, Inc., an Illinois corporation with its principal place of business in Brimfield, Illinois.  D'Acquisto consented to the

assignment and signed a "Restated Memorandum of Understanding" with Oak Leaf "to clarify the identity of the parties to this transaction, in light of the Assignment from Weaver to Oak Leaf." Dkt. 53-8. D'Acquisto understood at the time the agreements were signed in June 2006 that Oak Leaf and not Weaver Enterprises would carry on the tree stand business. Lone Wolf Manufacturing was dissolved by the State of Wisconsin.

### A. Exclusive and Non-Exclusive Uses

Section I of the license agreement grants Oak Leaf—as the assignee of Weaver Enterprises—the *exclusive* right to use the LONE WOLF® mark "in connection with the manufacturing, advertising, promotion, and sale of Category I and Exhibit A Products." Dkt. 1-3 at 1. Category I products are defined in the accompanying Consulting Agreement as tree stands, "hang ons" and "climbers," climbing sticks, tree stand accessories, and hats and t-shirts bearing the Lone Wolf Portable Tree stands brand. *See* dkt. 53-13 at 6. Exhibit A, which is attached to the licensing agreement, lists 24 products, including "Alpha sit and climb seats" and "Alpha hand climber seats." Dkt. 1-3 at 8.

In addition, Section 1 gives Oak Leaf a *non-exclusive* right to use the LONE WOLF® mark on "Category II and III Products," which are defined in the accompanying Consulting Agreement to include: ground blinds, deer carts, portable stools/chairs, ground mount bow holders, hanging bow holders for ground blinds, decoys and decoy launchers, clothing products other than hats and t-shirts with the Lone Wolf Portable Tree Stand Logo, and muzzle loaders. *Id.* at 1-2; dkt. 53-13 at 8-9.

### B.  Quality, Inspection, and Approval

Sections 2.1 to 2.4 of the license agreement set a baseline level of quality that Oak Leaf must maintain in its products and give D'Acquisto the right to inspect the quality of the products:

QUALITY, INSPECTION AND APPROVAL

> 2.1.  LICENSEE represents and warrants that it will maintain the quality of Category I and Exhibit A Products and Category II and III Products at least at a level that meets industry standards and is commensurate with the quality of products previously manufactured and sold by LICENSOR.

> 2.2.  LICENSEE represents and warrants that it will comply with the applicable laws, rules and regulations relating to the production, promotion, and sale of Category I and Exhibit A Products and Category II and III Products and will not violate or infringe any right of any third party.

> 2.3.  LICENSEE agrees that the nature and quality of all Category I and Exhibit A Products and Category II and III Products in connection with the Licenses Trademarks shall conform to the standards set by LICENSOR.  LICENSOR shall have the sole right and discretion to determine whether the Licensed Products are of satisfactory quality.

> 2.4.  LICENSEE shall on request provide the LICENSOR representative samples of the Category I and Exhibit A Products and Category II and III Products, and LICENSOR or its authorized representatives shall have the right to inspect LICENSEE'S business operations conducted in connection with the Licensed Trademark.

Dkt. 1-3 at 2.

### C. Trademark Ownership and Infringement

Regarding trademark ownership, the license agreement provides that:

> 4.1   LICENSEE acknowledges and agrees that the Licensed Trademark, all goodwill associated therewith, and all registrations thereof are owned solely by LICENSOR and LICENSEE shall never directly or indirectly contest the ownership or validity of the trademark.
>
> 4.2   All use of the Licensed Trademark shall inure solely to the benefit of and be on behalf of LICENSOR;
>
> 4.3   The License granted herein is not intended to be and shall not be construed as an Assignment; and further, nothing herein confers on LICENSEE any right, title or interest in the Licensed Trademark other than the limited right to use same in accordance with this Agreement;
>
> 4.4   LICENSEE shall not do or cause to be done, or omit to do or be done, anything impairing or intending to impair any of the rights of LICENSOR in the Licensed Trademark;
>
> *   *   *

Dkt. 1-3 at 2-3.

Section 5 of the license agreement further provides that the licensor grants no rights other than those granted in the agreement and that the licensee shall not directly or indirectly "use any of LICENSOR'S trade names, trademarks, service marks, domain names or trade dress, other than the Licensed Trademark" or "[a]pply to register or own any registration of the Licensed Trademarks or any trademarks confusingly similar thereto anywhere in the world." Dkt. 1-3 at 3, §§ 5.2 and 5.3.

Under Section 6 of the agreement, "LICENSEE shall promptly notify LICENSOR of any suspected infringement of or challenge to the Licensed Trademark.  LICENSOR shall have the

7

right in its sole discretion to decide what, if any, action to take and whether to institute and prosecute any actions or proceedings."  Dkt. 1-3 at 3.

### D.  Royalty Payments and Sales Reports

In consideration of the exclusive license for Category I and Exhibit A products, Oak Leaf is to make a one-time non-refundable royalty payment of $400,000.  *See* dkt. 1-3, § 7.1.  With respect to the nonexclusive license for Category II and III products, Oak Leaf is to pay D'Acquisto a royalty of 15% of net sales, to be accounted for based on calendar quarters throughout the licensed term and paid within 30 days following the end of each calendar quarter.  *Id.* at § 7.2.  Also within 30 days of the close of each calendar quarter, Oak Leaf must submit to D'Acquisto a written report "relating to and including a calculation of the Net Sales made by LICENSEE during said quarter which shall include a breakdown of sales by product." *Id.* at § 7.4.

### E.  License Term and Termination Provisions

Under Section 8.1, the term of the exclusive license "shall last for the entire term of the Licensed Trademark, except as provided for in Sections 2.1-2.4."  Dkt. 1-3 at 4.  Otherwise, the agreement automatically renews for successive one-year periods if all royalties are timely paid. *Id.*, § 8.2.

The non-exclusive license for Category II and II products is subject to termination under Section 8.3(i) for a breach that remains uncured for 30 days.  In the event of termination of the non-exclusive license, Section 8.4 requires the licensee to immediately discontinue all use of the

licensed mark and "any term(s) confusingly similar thereto;" cease all promotion, sales, and/or distribution of the Category II and III products bearing the licensed mark; and destroy all printed materials bearing the licensed mark.

### III.  Oak Leaf's Use of Licensed Mark and Other Marks

Beginning in 2006, Oak Leaf used the LONE WOLF® trademark in connection with the licensed goods.  Since 2006, Oak Leaf also has used the wolf head mark depicted below on its hunting-related goods:



On March 31, 2010, Oak Leaf applied to register the above wolf head logo, and Registration No. 4077631 was granted on December 27, 2011.  Oak Leaf has used the wolf head logo in connection with certain of its goods and services since at least July 13, 2011.  Although D'Acquisto was fully aware of this use, he never objected to it.

Prior to executing the 2006 agreements, D'Acquisto sold Alpha-branded tree stands, but he has not sold any Alpha tree stands since that time.  Dennis Owens, an employee of Oak Leaf, registered the name "ALPHA" as a trademark for Oak Leaf's goods, including tree stands. D'Acquisto never claimed any trademark rights in the Alpha brand before this lawsuit.

Oak Leaf has used the term "Alpha" in conjunction with tree stands and apparel. According to Jared Schlipf, who was the president of Oak Leaf between 2006 and 2019, Oak

Leaf produced the Alpha Tech F1 hang-on tree stand to open up the market to a larger audience of customers who could not afford the Lone Wolf line of tree stands.  Schlipf testified that sometime before he left Oak Leaf in 2019 (possibly in 2018), Oak Leaf stopped making the Alpha Tech F1 stands.  There is no evidence that Oak Leaf made any use of the LONE WOLF® trademark on the Alpha Tech F1 Hang-On tree stand after August 9, 2018.  (Citing third-party websites such as Amazon and Braidaxe, A&L/D'Acquisto contend that Oak Leaf continues to sell "Lone Wolf Alpha Tech F1 tree stands" using the LONE WOLF® trademark to this day. Dkt. 72 at ¶ 110.  However, the cited websites do not constitute admissible evidence that Oak Leaf manufactured such products after August 9, 2018 or branded them with the LONE WOLF® name.  Similarly, the YouTube videos that A&L/D'Acquisto cite in support of their vague contention that "Oak Leaf sold the F1 Hang On stands using the LONE WOLF trademark," dkt. 72 at ¶ 111, only show Schlipf identifying a product as the "Lone Wolf Alpha Tech F1" from the company Lone Wolf Portable Treestands.  Moreover, the YouTube videos are dated January 6 and 12, 2014 and fail to establish whether Oak Leaf sold the product using the licensed trademark after January 2014.)

## IV.  Weaver Enterprises and Subsequent Litigation

Jerry Weaver owns Weaver Enterprises.  In 2006, Weaver Enterprises and Mr. Weaver made arrangements to pay D'Acquisto.  Dkt. 75 at 12-13.  To capitalize Oak Leaf, Weaver Enterprises put up some of its own money and Mr. Weaver borrowed money from a farm that he owns.  *Id.* at 13-14.  Oak Leaf never paid Weaver Enterprises for the assignment of the 2006 agreements, which became major assets of Oak Leaf.  At his deposition, Mr. Weaver testified

that "Weaver Enterprises is Jerry Weaver." *Id.* at 16.  He also explained that he and his wife Nancy Weaver together owned 192 of Oak Leaf's 400 shares.

Oak Leaf owes some amount of money to Weaver Enterprises and has a $3.2 million note payable to Jerry and Nancy Weaver. *See* dkt. 73-3 at 2.  Frank Lovich, the current president of Oak Leaf, testified at the company's Rule 30(b)(6) deposition that Oak Leaf was undercapitalized—meaning to him that it had cash flow issues—in 2018, 2019, and the third quarter of 2020.  Oak Leaf has not repaid Weaver Enterprises any of its debt since the middle to end of 2018.

In 2013, D'Acquisto sued Weaver Enterprises and Oak Leaf in the Circuit Court for Waukesha County, Wisconsin, alleging unpaid consulting fees. *See D'Acquisto v. Weaver Enterprises, Ltd., et al*, No. 13-cv-470 (Feb. 23, 2013); dkt. 53-9.  Weaver Enterprises also asserted claims against D'Acquisto in that lawsuit.  The case settled in 2015 with a payment to D'Acquisto for which Weaver Enterprises was jointly liable and a mutual release of all current and future claims, known and unknown.  The settlement agreement acknowledged Oak Leaf as Weaver Enterprises's assignee of all of the 2006 agreements.

## V. Alleged Termination of License Agreement

On October 25, 2017, D'Acquisto's attorney, Daniel Johnson, drafted a detailed letter to Oak Leaf's (former) attorney, Timothy Cassidy, questioning the validity of Weaver Enterprises's assignment of the license agreement to Oak Leaf, noting several quality concerns with Oak Leaf/Weaver Enterprises's products bearing the LONE WOLF® mark, and requesting sample products for quality evaluation and the most recent calendar quarter report of net sales

pursuant to §§ 2.1 - 2.4 and 7.4 of the license agreement.  *See* dkt. 1-4.  Under a heading entitled "Quality Control," D'Acquisto notified defendants that certain products were not of satisfactory quality to bear the LONE WOLF® trademark.

During the summer of 2018, D'Acquisto made his first visit to Oak Leaf's facilities to exercise his right of inspection.  On August 9, 2018, Attorney Johnson sent a second letter to Attorney Cassidy, reasserting the previous quality concerns and asserting some new ones, renewing the requests for product samples and the most recent quarter's net sales report, and stating that D'Acquisto would be evaluating Oak Leaf/Weaver Enterprises's compliance with royalty obligations upon receipt of additional information and expected royalties "with interest" for certain products.  The August 9, 2018 letter also warned that

> Oak Leaf is put on notice of potential termination of the June 9, 2006 license due to the issue[s] identified above. We expect to receive the requested items in a timely fashion.  After receipt of the requested materials and information, we will be reviewing the entirety of your response for consideration under the Term and Termination provisions of the Lone Wolf License, within 30 days.

*Id.* at 3.

Both the October 2017 letter and August 2018 letter instructed Oak Leaf/Weaver Enterprises  not to use the LONE WOLF® mark together with the Alpha or Alpha Tech names or other marks, but neither letter directly asserted that D'Acquisto owned these marks.

On September 11, 2018, Oak Leaf's attorney responded to D'Acquisto's correspondence, stating why D'Acquisto's quality concerns were unfounded and agreeing to send the requested royalty report and payments, along with the product samples, even though D'Acquisto had

already conducted an inspection several weeks before.  By October 15, 2018, Oak Leaf had not provided D'Acquisto with the product samples, royalty information, or payments.

In an October 15, 2018 letter, D'Acquisto's attorney notified Oak Leaf that D'Acquisto was terminating the exclusive and non-exclusive license agreement.  Dkt. 1-6.

A few days later, Oak Leaf sent the product samples, royalty report, and royalty payment[1] to D'Acquisto.  Oak Leaf's correspondence indicated that it had not paid royalties on about 4,800 Category II and III sweatshirts and decals and owed D'Acquisto $4,668.45 for $31,122.98 worth of goods sold between 2006 and 2017.

In a subsequent letter to D'Acquisto's attorney dated October 29, 2018, Oak Leaf explained that it would have made the shipment sooner had it not been the busiest time of year for its seasonal business.  Oak Leaf also stated that it did not believe that it was in breach of the license agreement, that D'Acquisto did not have any grounds to terminate the license, and that Oak Leaf would not stop using the LONE WOLF® trademark on its products.  D'Acquisto refused to accept delivery of the product samples and did not cash the royalty check.

## VI.  Use of LONE WOLF® and Unlicensed Marks After Alleged Termination

In a letter dated November 15, 2018, Oak Leaf again stated that it would continue to use the LONE WOLF® trademark, and the company continues to use that mark and its registered wolf head logo and Alpha name to the present day.

On June 16, 2020, D'Acquisto assigned all of his rights in Registration No. 2,733,871 (the LONE WOLF® mark) to A&L Industries, Inc. rather than to plaintiff A&L Industries, LLC.

---

[1] The royal payment check is dated October 25, 2018.  Dkt. 53-22.

On September 1, 2020, D'Acquisto corrected the mistake and made a number of other assignments to A&L Industries, LLC, including what he termed a "LONE WOLF name and wolf head logo common law marks," an "ALPHA trademark for tree stands," and the June 2006 license agreement.  He made the assignment retroactively effective to October 16, 2018 and included all title and interest in the specified marks throughout the world, along with the rights to assert the specified marks and collect for all past, present, and future infringements.  That assignment was recorded in the USPTO on October 5, 2020.

D'Acquisto and A&L began using the LONE WOLF® name with a wolf head mark on products bearing the name "Lone Wolf Custom Gear" after October 15, 2018.  For example, in January 2019, D'Acquisto appeared at a trade show with an entire booth's worth of Lone Wolf Custom Gear merchandise and advertising materials.  A&L did not use the licensed mark before D'Acquisto allegedly terminated the license agreement on October 15, 2018.  (The parties dispute whether D'Acquisto himself advertised and/or sold tree stands under the Lone Wolf Custom Gear mark before October 15, 2018.  Defendants point out that D'Acquisto testified at his deposition that he believed that he began selling "D'Acquisto Series" tree stands online through the Lone Wolf Custom Gear company before the termination but only labeled the tree stands with the Lone Wolf Custom Gear name after the termination.  Dkt. 55 at 165-66, 186-90.  However, in a later-filed affidavit, D'Acquisto avers that his testimony was incorrect and that he did not start selling Lone Wolf Custom Gear tree stands until after October 15, 2018, noting that he now recalled not selling any of these products before the 2019 trade show.  Dkt. 73-1 at 3-5.)

14

A&L continues to sell tree stands under the Lone Wolf Custom Gear brand name, along with the wolf head that D'Acquisto had used before the 2006 agreements:



Lovich, Oak Leaf's current president, does not know if A&L/D'Acquisto's Lone Wolf Custom Gear tree stands have decreased Oak Leaf's sales.

## ANALYSIS

### I. Legal Standards

#### A. Summary Judgment

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). When the parties cross-move for summary judgment, the court looks to the burden of proof that each party would bear on an issue at trial and requires that party to go beyond the pleadings to affirmatively establish a genuine issue of material fact. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party fails to establish the existence of an element essential to his or her case, and on

which that party will bear the burden at trial, then summary judgment against that party is appropriate. *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

### B. Trademark Law

Under the Lanham Act, a trademark is "any word, name, symbol, or device, or any combination thereof" used to identify and distinguish goods and products from those manufactured and sold by others and to indicate the source of the goods. 15 U.S.C. § 1127. A party may assert claims for trademark infringement under 15 U.S.C. § 1114(1) (registered marks) or unfair competition and false designation of origin under 15 U.S.C. § 1125(a) (common law marks and trade names). "To prevail on [a claim under either § 1114(1) or § 1125(a)], a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001). *See also Epic Systems Corp. v. YourCareUniverse, Inc.*, 244 F. Supp. 3d 878, 889 (W.D. Wis. 2017) (federal trademark infringement and unfair competition subject to same standard); *Box Acquisitions, LLC v. Box Packaging Products, LLC*, 32 F. Supp. 3d 927, 934 (N.D. Ill. 2014) ("Both of Plaintiff's federal trademark infringement and unfair competition claims involve the same elements and proof.").

"[W]here the trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized." *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008). But "[t]he likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license." *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88

F. Supp. 2d 914, 922 (C.D. Ill. 2000) (citing *Burger King v. Mason*, 710 F.2d 1480, 1492-93 (11th Cir.1983)); *see also Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) (continued use of trademark following termination of franchise agreement is violation of trademark law); *Avanti Ctr., Inc. v. Avanti Educ. Programs, Inc.*, No. 11-cv-196-bbc, 2011 WL 13244670, at *11 (W.D. Wis. Dec. 21, 2011) (same).  Trademark license contract disputes are governed by the general rules of contract interpretation.  3 *McCarthy on Trademarks and Unfair Competition* § 18:43 (5th ed. 2021).

The parties' state common law claims of infringement and unfair competition have the same elements and threshold requirements as their federal counterparts.  *Ritter v. Farrow*, 2021 WI 14, ¶ 25, 395 Wis. 2d 787, 799, 955 N.W.2d 122, 128 (Because "Wisconsin courts have recognized that the state's jurisprudence on trademark law is 'undeveloped'", they "look to federal law for guidance and key principles."); *see also Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989) (reviewing elements of Wisconsin common law trademark infringement claim); *Children's Med. Grp., Inc. v. Lake Cty. Pediatrics, S.C.*, 417 F. Supp. 3d 1152, 1156 (E.D. Wis. 2019) ("The analysis is essentially the same for unfair competition under the Lanham Act and under the common law."); *Mgmt. Grp., LLC v. T&G Consultant Agency, LLC*, No. 16-cv- 470-wmc, 2016 WL 3830585, at *3 (W.D. Wis. July 12, 2016) (citing *First Wis. Nat'l Bank v. Wichman*, 85 Wis. 2d 54, 64-66, 270 N.W.2d 168, 173-74 (1978) and *Madison Reprographics, Inc. v. Cook's Reprographics, Inc.*, 203 Wis. 2d 226, 234, 552 N.W.2d 440, 444-45 (Ct. App. 1996), for same).

## II.  Summary of the Parties' Disputes

The parties do not dispute that A&L's alleged predecessor, D'Acquisto, granted Oak Leaf's predecessor-in-interest, Weaver Enterprises, a license to use the LONE WOLF® trademark.  Instead, the parties' dispute centers on whether D'Acquisto legally terminated the 2006 license agreement in 2018, thereby removing Oak Leaf's right to use the LONE WOLF® trademark.  A&L/D'Acquisto argue that D'Acquisto legally terminated the license agreement and that Oak Leaf's continued use of the LONE WOLF® mark (and confusingly similar marks) violates A&L's trademark rights and the terms of the license agreement.

Contrariwise, Oak Leaf/Weaver Enterprises contend that because D'Acquisto had no authority or grounds to terminate the license agreement, Oak Leaf never lost the right to use the LONE WOLF® mark, so that A&L's/D'Acquisto's use of the mark is a breach of the license agreement and the exclusive trademark rights conveyed to Oak Leaf under the agreement.

Next, although Weaver Enterprises assigned all of its rights and responsibilities under the license and other agreements to Oak Leaf soon after executing them in 2006, the parties dispute what role, if any, that Weaver Enterprises has in this lawsuit.

Finally, the parties dispute whether A&L/D'Acquisto have shown a protectable right in a wolf head common law mark and Alpha name and whether Oak Leaf's use of these marks violates A&L's (formerly D'Acquisto's) trademark rights.

Specifically, A&L/D'Acquisto allege that:

> (1)  Weaver Enterprises/Oak Leaf's continued use of the LONE WOLF® trademark and the confusingly similar wolf head logo after the termination of the license agreement in October 2018 infringe A&L's registered trademark in violation of the Lanham Act.  Dkt. 1, Count I at pp.12-15.

    (2)     Weaver Enterprises/Oak Leaf's use of the LONE WOLF® trademark, the wolf head logo, and the Alpha name constitutes unfair competition and false designation of origin under the Lanham Act and Wisconsin common law. Dkt. 1, Counts II and III at pp.15-17.

    (3)     Weaver Enterprises/Oak Leaf breached the license agreement by not timely reporting and paying royalties (Sections 7.2 and 7.4), not providing representative product samples (Section 2.4), and not discontinuing use of the LONE WOLF® mark and confusingly similar marks following the alleged October 2018 termination (Section 8.4). Dkt. 1, Count IV at p.17.

Oak Leaf counterclaims that:

    (1)     D'Acquisto and A&L violated the Lanham Act and Wisconsin common law by using the LONE WOLF® mark to which Oak Leaf held exclusive rights under the license agreement. Dkt. 38, Counts I and II.

    (2)     D'Acquisto breached the license agreement by purporting to terminate and assign it to A&L, and A&L and/or D'Acquisto are using the LONE WOLF® mark on hunting products in a manner that breaches their obligations as licensor under the license agreement. Dkt. 38, Count III.

    (3)     D'Acquisto and A&L violated the Illinois Franchise Disclosure Act (IFDA) by purporting to terminate a franchise without good or adequate cause. Dkt. 38, Count IV.

Because most of these claims hinge on whether D'Acquisto terminated the license agreement legally and in good faith, I will address that issue first. Next, I will discuss A&L/D'Acquisto's trademark and breach of contract claims related to Oak Leaf's use of the wolf head logo and the Alpha name. Finally, I will address A&L/D'Acquisto's contention that Weaver Enterprises may be held liable for Oak Leaf's alleged trademark and breach of contract violations.

19

### III.  Alleged Termination of License Agreement

The license agreement contains very few provisions regarding the duration of the agreement and its termination.  Section 8.1 provides that the term of the exclusive license "shall last for the entire term of the Licensed Trademark, except as provided for in Sections 2.1-2.4," which relate to quality, inspection, and approval of all products bearing the licensed mark.  The non-exclusive license for Category II and III products is subject to termination under Section 8.3(i) for a breach that remains uncured for 30 days.

A&L/D'Acquisto contend that D'Acquisto terminated the exclusive license on October 15, 2018 based on Oak Leaf's failure to provide product samples upon request, as required by Section 2.4.  A&L/D'Acquisto contend that D'Acquisto terminated the non-exclusive license on the same day, based on Oak Leaf's failure to file quarterly net sales reports and pay royalties, as required under Sections 7.2 and 7.4, and did not do so within 30 days of D'Acquisto's initial requests for the quarterly reports.[2]

The facts surrounding the events in question are largely undisputed.  On October 25, 2017 and again on August 9, 2018, D'Acquisto requested representative samples of Category

_____

[2] D'Acquisto's three letters to defendants also reference his concerns with potential violations of Sections 2.1 and 2.3, relating to the quality of Oak Leaf's LONE WOLF® branded goods, and Section 5, which precludes Oak Leaf from using D'Acquisto's other marks and applying to register or own any registration of trademarks confusingly similar to the licensed mark (here, the wolf head logo and Alpha name).  Although A&L/D'Acquisto state in a footnote to their summary judgment brief that they "reserve the right at trial to prove factual predicates for breaches of §§ 2.1 and 2.3," dkt. 44 at 5, they do not argue in their motion for summary judgment that Oak Leaf's alleged breaches of Sections 2.1, 2.3, and 5 gave D'Acquisto independent grounds on which to terminate the license agreement.  Because the court concludes for the reasons set out below that D'Acquisto had other valid reasons for ending the exclusive and non-exclusive license, it is unnecessary to address Oak Leaf/Weaver Enterprises's summary judgment arguments that D'Acquisto's quality concerns and Oak Leaf's use/registration of the wolf head logo and Alpha name do not provide a legitimate and good faith basis for termination.  In addition, A&L/D'Acquisto did not plead separate breach of contract claims based on Oak Leaf's alleged violations of Sections 2.1, 2.3, and 5, so I have not addressed any such claims.

I-III and Exhibit A products and the most recent net sales quarterly report for Category II and III products (including a breakdown by product as referenced).  At the time of the letters, Oak Leaf also had not yet paid any royalties due on the Category II and III products that were subject to the non-exclusive license.  Oak Leaf does not dispute that it failed to produce the requested materials and royalty payments before D'Acquisto sent his intended termination letter on October 15, 2018.  Even though Oak Leaf told D'Acquisto on September 11, 2018 that it would send the requested product samples and quarterly reports, it did not do so until late October 2018.  Oak Leaf also waited until October 25, 2018 to cut D'Acquisto a check for the $4,668.45 in royalty payments that it owed on Category II and III goods that it had sold since 2006.

Oak Leaf/Weaver Enterprises don't dispute that failure to produce the requested materials and failure to pay royalties qualify as breaches of the license agreement.  Rather, they contend that D'Acquisto lacked authority to terminate the exclusive and non-exclusive license under the plain terms of the license agreement. They also contend that Oak Leaf actually produced the required materials, just later than D'Acquisto expected.  Finally they contend that any violations by Oak Leaf' were minor and did not amount to a material breach of the parties' agreement.  I will discuss separately the parties' arguments with respect to each type of license.


### A.  Exclusive License

Section 2.4 requires the licensee to provide representative product samples to the licensor upon request and also provides that the licensor has the right to inspect the licensee's business operations.   A&L/D'Acquisto contend that Oak Leaf's failure to respond to D'Acquisto's requests to provide the product samples for almost a year breached Section 2.4 and permitted

D'Acquisto to terminate the exclusive license under Section 8.1.  Oak Leaf/Weaver Enterprises point out that Section 8.1 merely cross references Sections 2.1-2.4, which only set quality standards and do not affirmatively provide a basis for termination if those requirements are not met.  I am not persuaded by Oak Leaf/Weaver Enterprises's argument.

In construing a contract under Wisconsin law,[3] the court must "ascertain the true intentions of the parties as expressed by the contractual language," giving the contract's terms "their plain or ordinary meaning."  *Betz v. Diamond Jim's Auto Sales*, 2014 WI 66, ¶¶ 38-39, 355 Wis. 2d 301, 320, 849 N.W.2d 292, 302 (quoting *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134,¶ 33, 330 Wis.2d 340, 793 N.W.2d 476; *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis.2d 169, 716 N.W.2d 807); *see also Wisconsin Loc. Gov't Prop. Ins. Fund v. Lexington Ins. Co.*, 100 F. Supp. 3d 687, 692 (E.D. Wis. 2015), *aff'd*, 840 F.3d 411 (7th Cir. 2016) (same).  So long as the terms of the license agreement "are clear and unambiguous," the court must construe it "'according to its literal terms,' and consistent with 'what a reasonable person would understand the words to mean under the circumstances.'"  *Wisconsin Loc. Gov't Prop.*, 100 F. Supp. 3d at 692 (quoting *Fabco Equip., Inc. v. Kreilkamp Trucking, Inc.*, 2013 WI App 141, ¶ 6, 352 Wis.2d 106, 841 N.W.2d 542).  "Only when the contract is ambiguous, meaning it is susceptible to more than one reasonable interpretation, may the court look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent."  *Town Bank*, 330 Wis.2d 340, ¶ 33, 793 N.W.2d 476 (quoting *Huml*, 293 Wis.2d 169, ¶ 52, 716 N.W.2d 807).

---

[3] Section 13 of the license agreement states that it is governed by federal and Wisconsin law, and the parties agree that Wisconsin law applies in this case.

Here, neither party has argued that Section 8.1 is ambiguous, and I agree that this provision is not susceptible to more than one meaning.  Sections 8.1 and 2.4 must be read together, and the only reasonable reading of Section 8.1 is that the term of the exclusive license ends if the licensee fails to comply with Section 2.4.  *See* 13 *Corbin on Contracts* § 67.2 (2021) ("When, by the express terms of the parties' agreement, a party reserves a power to 'terminate' the agreement *or the agreement 'terminates' upon the happening of an event*, it is more likely intended that the exercise of the power will affect the rights and duties of both parties and that further performance according to the contract will no longer be required of either of them.") (emphasis added); 87 *C.J.S. Trademarks, Trade Names, and Unfair Competition* § 267 (2021) ("A trademark license agreement may grant a perpetual license, subject to the agreement's provisions governing termination for a material breach or act of default . . ."); *Klug v. Flambeau Plastics Corp.*, 62 Wis. 2d 141, 149, 214 N.W.2d 281, 284-85 (1974) ("It is enough to contractually provide that the contract will end on the happening of a specific event, even though it is not possible to name the date when that event will occur."); *Consol. Labs., Inc. v. Shandon Sci. Co.*, 413 F.2d 208, 212 (7th Cir. 1969) ("Here it is abundantly clear that the agreement was to continue in effect until Shandon of London appoints a new main distributor and Consolidated becomes a main dealer of Shandon products as assured in the 1965 letter agreement.").  Otherwise, there would be no reason to link the term of the exclusive license to the provisions regarding product quality, inspections, and approval.  *See Sonday v. Dave Kohel Agency, Inc.*, 2006 WI 92, ¶ 21, 293 Wis. 2d 458, 471, 718 N.W.2d 631, 637 ("We interpret a contract to give 'reasonable meaning to each provision and without rendering any portion superfluous.'").

In this instance, after Oak Leaf twice failed to provide D'Acquisto product samples upon request as it was required to do under Section 2.4, the term of the exclusive license agreement came to an end.  D'Acquisto first requested the product samples in 2017, but Oak Leaf did not produce them until after receiving the termination letter more than a year later.  Although Oak Leaf/Weaver Enterprises correctly point out that neither the license agreement nor D'Acquisto's letters specified a deadline by which Oak Leaf had to produce the product samples, D'Acquisto waited a reasonable amount of time (about two months) after the August 2018 letter to terminate the agreement.  *See generally,* 13 *Corbin on Contracts* § 68.9 ("If not so provided, the agreement may be terminated at any time upon reasonable notice by either party."); *Oostburg State Bank v. United Sav. & Loan Ass'n,* 125 Wis. 2d 224, 234-35, 372 N.W.2d 471, 476 (Ct. App. 1985), *aff'd,* 130 Wis. 2d 4, 386 N.W.2d 53 (1986) ("If a contract is silent as to duration, then either party may terminate it by giving reasonable notice to the other party of the intent to terminate.") (citing *California Wine Association v. Wisconsin Liquor Co.,* 20 Wis.2d 110, 124-25, 121 N.W.2d 308, 316 (1963); *City of Milwaukee v. City of West Allis,* 217 Wis. 614, 618, 258 N.W. 851, 852 (1935)).

Oak Leaf/Weaver Enterprises argue that D'Acquisto toured the manufacturing facility in the summer of 2018 and could have inspected samples at that time, and that Oak Leaf responded to D'Acquisto by promising on September 11, 2018 to send the product samples. But Oak Leaf/Weaver Enterprises have not cited any authority showing that either of these events satisfied or excused Oak Leaf's contractual obligation to actually provide D'Acquisto with the requested product samples.  As A&L/D'Acquisto point out, Oak Leaf's duty to provide

24

product samples was independent of its duty to allow D'Acquisto to inspect its manufacturing facility.

Therefore, no reasonable jury could find that D'Acquisto overstepped his authority or breached the terms of the license agreement by notifying Oak Leaf/Weaver Enterprises on October 15, 2018 that he was ending the exclusive license. *See Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 679 (E.D. Wis. 2005) ("[A] party can only exercise a power of termination reserved in a contract in accord with the contractual terms governing the exercise of such power."); 13 *Corbin on Contracts* § 68.9 ("The extent of a reserved power is determined by interpretation of the terms of the contract. The power reserved may be extremely limited or very broad in its coverage."); *id.* ("If a contractual privilege to put an end to a contract . . . is subject to the condition of some breach of duty by the other party, the occurrence of such a breach or some unsatisfactory performance is a condition precedent to the exercise of this privilege.").

### B.  Non-Exclusive License

A&L/D'Acquisto contend that D'Acquisto had the authority to terminate the non-exclusive license under Section 8.3(i) because Oak Leaf failed to provide the quarterly net sales reports and royalty payments for Category II and III products required under Sections 7.2 and 7.3 within 30 days of D'Acquisto's requests for these items.  In addition, they contend that Oak Leaf violated Section 8.4 of the agreement by failing to immediately discontinue use of the licensed mark and confusingly similar marks upon termination of the non-exclusive license.

Oak Leaf/Weaver Enterprises respond that the letters sent by D'Acquisto's attorney only "requested" the royalty reports, payments, and product samples, all of which Oak Leaf

"promptly" agreed in writing to produce.   According to Oak Leaf/Weaver Enterprises, D'Acquisto never actually notified Oak Leaf that it was in breach of the license agreement for its failure to submit royalty reports or payments until he sent his October 15, 2018 letter.  Oak Leaf/Weaver Enterprises also point out that Oak Leaf cured the breach within 30 days of that letter.

Although D'Acquisto's October 2017 letter does not expressly state that Oak Leaf/Weaver Enterprises were in breach of the license agreement, his August 2018 letter unambiguously stated that "Oak Leaf is put on notice of potential termination of the June 9, 2006 license due to the issue[s] identified above," which included the missing royalty reports and payments.  No reasonable jury would conclude that this letter failed to notify defendants of the alleged breaches. *See Wis. Alumni Research v. Xenon Pharmaceuticals*, 591 F.3d 876, 887-88 (7th Cir. 2010) (Plaintiff's written statement requiring defendant to remit payment amounts owed under the agreement "plainly gave" defendant notice that plaintiff "considered it to be in breach of its payment obligations under the Exclusive License Agreement.").  The August 2018 letter went on to state that D'Acquisto expected to receive the requested items in a timely fashion, and that he would consider the term and termination provisions in the license agreement within 30 days of receiving the items.  Although the letter did not expressly provide a 30-day right to cure, D'Acquisto did not take action to end the non-exclusive license until more than two months had passed. *See id.* at 888 (finding nothing more required as to 90-day right to cure because more than 90 days elapsed between time of notice and termination letter).

Even though Oak Leaf responded to the August 2018 letter on September 11, 2018 by *promising* to produce the requested items, another 30 days passed without production.  In fact,

Oak Leaf did not act to cure the alleged breaches until late October 2018, *after* D'Acquisto notified Oak Leaf that he was terminating the agreement on October 15, 2018. Therefore, a reasonable jury could not conclude that Oak Leaf's actions cured its breach within 30 days of receiving notice of the breach, as required by Section 8.3(i).

Oak Leaf/Weaver Enterprises also argue in response to A&L/D'Acquisto's motion for summary judgment that Oak Leaf's delay in providing reports and product samples and paying royalties were not material breaches.[4] However, I am not persuaded by Oak Leaf/Weaver Enterprises's arguments or cited legal authority.

As they did with respect to the product samples, Oak Leaf/Weaver Enterprises explain that Oak Leaf was late producing the requested royalty reports and payments because it was during the busy hunting season. But Sections 7.2 and 7.4 of the license agreement require the licensee to send royalty reports and to pay royalties within 30 days of the close of each calendar quarter *during the entire period of the agreement*. It is undisputed that Oak Leaf did not send *any* royalty reports before October 15, 2018. Oak Leaf/Weaver Enterprises attempt to excuse Oak Leaf's past defaults by blaming D'Acquisto for not attempting to collect the royalties and reports for 11 years and engaging in new business discussions with Oak Leaf after sending his October 2017 letter.[5] However, defendants fail to develop any meaningful argument on these issues and

---

[4] Although Oak Leaf/Weaver Enterprises also cursorily raised this point in their affirmative motion for summary judgment, dkt. 51 at 10-11, they failed to develop any meaningful argument supporting their contention. As a result, their argument that A&L/D'Acquisto forfeited the issue by not addressing it in their response to Oak Leaf/Weaver Enterprises's motion for summary judgment is itself waived. *Cloudier v. GoJet Airlines, LLC*, 996 F.3d 426, 450-51 (7th Cir. 2021)

[5] In a related argument, defendants contend that any royalty payments owed before the August 2015 release signed in their prior lawsuit are not recoverable. Because I agree with A&L that this issue relates more appropriately to the issue of damages, I have not addressed it.

do not cite any authority showing that Oak Leaf's breach could be excused on these grounds. That constitutes waiver. *Cloudier*, 996 F.3d at 450-51.

Oak Leaf/Weaver Enterprises point out that Section 7.3 of the agreement contemplates the late payment of royalties and creates a remedy for them: the payment of interest at the annual rate of 6%. However, Oak Leaf never paid or offered to pay interest either before or after termination of the agreement, despite having ample opportunity to remedy this breach. Further, as A&L/D'Acquisto argue, Section 7.3 provides that the licensor's right to receive interest is "without prejudice to any other rights or remedies that LICENSOR may have against LICENSEE." Dkt. 1-3 at 4.

Oak Leaf/Weaver Enterprises further argue that a minor delay in paying $4,668.45 in royalties in a transaction worth over $4.5 million does not amount to a material breach. In support, they cite *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 595 (7th Cir. 2009), and *Pacific Cycle, Inc. v. PowerGroup Int'l, LLC*, 969 F. Supp. 2d 1098, 1116 (W.D. Wis. 2013), for the proposition that *only* material breaches destroying the essential object of the agreement will excuse the non-breaching party from its contractual performance and provide a basis for damages. This proposition is correct as far as it goes, but it doesn't account for a party exercising a right to terminate that is provided for in the contract. *Manpower*, 377 F. Supp. 2d at 678; 13 *Corbin on Contracts* § 68.9 ("Th[e] power to terminate must, however, be distinguished from the right an injured party has to cancel the contract for a breach that is a total breach of contract or that goes to the essence of the agreement.").

In any event, Oak Leaf/Weaver Enterprises rely too heavily on this court's statement in *Pacific Cycle* that "[i]f the breach is relatively minor, the non-breaching party will not be excused

28

from its contractual performance." 969 F. Supp. 2d at 1166. Although that holding referred to Pacific Cycle's failure to disclose certain documents (pre-season order forms or dealer agreements) to its licensee PowerGroup, this court made clear that PowerGroup had "failed to present evidence that the breach caused any injury or otherwise destroyed the essential object of the agreement." *Id.* For example, PowerGroup already had received full information about the pre orders and could not show why the additional information was necessary to run its business or enforce its rights. *Id.* Although Oak Leaf/Weaver Enterprises attempt to characterize the amount of the royalties owed in this case and its failure to provide documents as minor violations, their argument that Oak Leaf's breaches were not material is unpersuasive.

The court of appeals has explained that "[a] breach is material if it destroys the essential object of the agreement *or deprives the non-breaching party of a benefit that the party reasonably expected*." *Int'l Prod. Specialists*, 580 F.3d at 595 (emphasis added). Both criteria are met in this case. Unlike the documents at issue in *Pacific Cycle*, it is clear from the terms of the parties' license agreement that the payment of royalties and the quality of LONE WOLF® products were essential objects of the agreement that D'Acquisto expected as benefits in return for issuing the license. Oak Leaf's failure to produce royalty reports and sample products and to pay royalties prevented D'Acquisto from ensuring that he obtained these benefits.

Accordingly, a reasonable jury would not find that D'Acquisto improperly or illegally terminated the non-exclusive license.

29

C.    **Claims and Counterclaims Related to Post-Termination Use of LONE WOLF® Mark**[6]

Because I have concluded that D'Acquisto validly terminated the license agreement, A&L is entitled to summary judgment with respect to its three trademark claims (Counts I-III) and its breach of contract claim (Count IV) regarding Oak Leaf's use of the LONE WOLF® mark after the termination of the license agreement on October 15, 2018. These claims will proceed to trial solely on the issue of damages.

The flipside of this coin is that A&L/D'Acquisto are entitled to summary judgment on Oak Leaf's trademark counterclaims (I and II), breach of contract counterclaim (III), and IFDA counterclaim (IV)[7] that arise out of A&L/D'Acquisto's use of the LONE WOLF® mark after October 15, 2018. Because Oak Leaf no longer held an exclusive license to the LONE WOLF® mark, A&L (and D'Acquisto, presumably with A&L's permission) were free to sell products using the LONE WOLF® mark.

D.  **Oak Leaf's Counterclaims Regarding Pre-Termination Use of Mark**

As mentioned in the fact section of this opinion, there is some dispute as to whether D'Acquisto personally used the licensed mark as part of his Lone Wolf Custom Gear brand *before*

---

[6] A&L's claims regarding the wolf head logo and Alpha name will be discussed in the next section of this opinion.

[7] Defendants made clear in their motion to amend their answer and counterclaims, dkt. 33 at 4, their amended pleading, dkt. 38 at ¶ 54, and response to A&L's motion or summary judgment, dkt. 68 at 27, that their IFDA counterclaim is based solely on D'Acquisto's alleged wrongful termination of the license agreement. Because I have decided that issue in A&L/D'Acquisto's favor, it is unnecessary to consider A&L/D'Acquisto's contentions that this counterclaim is barred by the applicable statute of limitations, and that the license agreement does not qualify as a franchise agreement under the IFDA..

the termination of the exclusive license.[8]  Although it is not entirely clear from the parties' briefs, it appears that Oak Leaf is alleging and pursuing a counterclaim that D'Acquisto violated its trademark rights and breached the exclusive licensing agreement by advertising and selling products using the LONE WOLF® mark prior to terminating the agreement in October 2018. These claims affect only those products, such as tree stands, that were subject to the exclusive license agreement.

### 1.  Trademark Counterclaims

Relying on *Westowne Shoes, Inc. v. Brown Grp., Inc.*, 104 F.3d 994, 997 (7th Cir. 1997), A&L/D'Acquisto argue that Oak Leaf, as the sole licensee of the LONE WOLF® mark, does not have standing to sue them for trademark infringement or unfair competition under federal or state law.  They are correct.  A "trademark owner-licensor cannot be liable for trademark infringement to its exclusive licensee because a licensee has no ownership rights in the licensed mark to assert against its licensor."  3 *McCarthy on Trademarks and Unfair Competition* § 18:44.50 (5th ed. 2021).  This is because a "licensee's use of the mark inures to the benefit of the licensor-owner and the licensee acquires no ownership rights in the mark itself."  *Id.* at § 18:52.

Oak Leaf/Weaver Enterprises point out that the year after *Westowne*, the Seventh Circuit stated that "a truly exclusive licensee, one who has the right even to exclude his licensor from using the mark . . . is equated with an assign[ee] since no right to use [the mark] is reserved to

---

[8] Oak Leaf has not alleged or developed any argument that A&L/D'Acquisto violated Oak Leaf's rights with respect to products previously governed by the non-exclusive license.  It also has not presented sufficient evidence from which a reasonable jury could conclude that A&L used the licensed mark during the term of the exclusive license.

the licensor, and the licensee's standing derives from his presumed status as an assignee." *Finance Investment Co. (Bermuda) v. Geberit AG*, 165 F.3d 526, 531-32 (7th Cir. 1998) (quoting 3 Jerome Gilson, *Trademark Protection & Practice* § 8.16[1][b] (1997)).  However, *Finance Investment* did not cite *Westowne* or deal with the situation presented in this case:  here, a trademark licensee is attempting to sue the trademark owner for trademark infringement.  In *Finance Investment*, the exclusive licensee was attempting to sue a third party for trademark infringement.  *Id.* at 529-32.  Moreover, the court of appeals held that "a statutory right to sue as an 'exclusive licensee' depends on the language of its license agreement" and "[o]ne glance at this document . . . puts to rest any argument that FIC's 'exclusive license' was tantamount to an assignment."  *Id.* at 532.  In the instant case, Section 4.3 of the license agreement makes clear that "[t]he License granted herein is not intended to be and shall not be construed as an Assignment."  In addition, Section 6 of the agreement states that the "LICENSOR shall have the right in its sole discretion to decide what, if any, [enforcement] action to take and whether to institute and prosecute any actions or proceedings."  Therefore, *Finance Investment* does not grant Oak Leaf standing to sue A&L/D'Acquisto for trademark infringement.

Oak Leaf point outs that 15 U.S.C. §1125(a) confers standing to "any person who believes that he or she is or is likely to be damaged" by an act violating the statute, 6 *McCarthy on Trademarks and Unfair Competition* § 32:12 (non-owner of mark may have standing to sue under§ 1125(a)), but its §1125(a) claim fails for the same reason that its § 1114 claim fails.  *See id.* ("[I]f the license agreement prohibits the licensee from having the right to sue, then it has no right to sue under [§ 1125(a)].");  *Finance Investment*, 165 F.3d at 532 ("Even assuming [the licensed distributors] met the statutory requirement of being a 'person who believes that he or

she is likely to be damaged' by a likelihood of confusion, the express terms of the license prohibited any of them from bringing suit in their own capacity. . . . Because the license is the sole source giving the plaintiffs any interest in the CLOSOMAT mark, that same license's refusal to give them the right to sue under these circumstances strips them of the right to raise a [§ 1125(a)] claim."); *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 709 (11th Cir. 2019) (Licensee did not have standing to sue for trademark infringement under § 1125(a) because "[t]he provisions of the license 'read together indicate that [the trademark owner] alone has the exclusive right to sue for infringement.'"). Accordingly, A&L/D'Acquisto are entitled to summary judgment with respect to Oak Leaf's trademark counterclaims regarding D'Acquisto's use of the licensed mark prior to the termination of the exclusive license.

### 2. Breach of Contract Counterclaim

This leaves Oak Leaf's breach of contract counterclaim against D'Acquisto for his pre-termination use of the licensed mark. *This* claim is actionable. *See* 3 *McCarthy on Trademarks and Unfair Competition* § 18:44.50 ("If a trademark license is exclusive, then the licensor's own use in conflict with the licensed use can be a breach of contract because it is inconsistent with the licensee's exclusive right to use."). To succeed on its breach of contract counterclaim, Oak Leaf must show: 1) a valid contract; 2) breach of that contract; and 3) damages. *Matthews v. Wisconsin Energy Corp., Inc.*, 642 F.3d 565, 571 (7th Cir. 2011) (glossing Wisconsin law); *Pacific Cycle*, 969 F. Supp. 2d at 1108-09; *Cousin Subs Systems Inc. v. Better Subs Development Inc.*, 2011 WL 4585541, *9 (E.D. Wis. Sept. 30, 2011).

A&L/D'Acquisto argue that Oak Leaf has no evidence to prove the required element of damages because Lovich, Oak Leaf's president, testified that he did not know whether D'Acquisto's Lone Wolf Custom Gear tree stands harmed Oak Leaf in any way. *See Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 432-33, 265 N.W.2d 513 (1978) ("Damages may not be awarded on speculation or conjecture alone.") (citations omitted); *Dakota, Minn. & E. R.R. Corp. v. Wis. & S. R.R. Co.*, No. 09-cv-00516-wmc, 2010 WL 3282936, at *13 (W.D. Wis. Aug. 19, 2010), *aff'd*, 657 F.3d 615 (7th Cir. 2011) ("The mere speculation of future damage is not sufficient to withstand summary judgment.") (citations omitted).  Oak Leaf explains in its June 4, 2021 response brief (dkt. 68 at 27) that at the time of Lovich's deposition, A&L/D'Acquisto had only just produced financial information in response to Oak Leaf's discovery requests and that come trial, it will be able to prove damages consisting of lost profits resulting from the alleged breach.  Although that may be the case, Oak Leaf has not alleged that the evidence that it needs to prove damages was unavailable or remains unavailable.  In fact, Oak Leaf says that it received responses to its discovery requests related to damages a few days before Lovich's deposition on May 5, 2021.  Moreover, Oak Leaf did not file a motion pursuant to Fed. R. Civ. P. 56(d) seeking additional time to obtain discovery before responding to A&L/D'Acquisto's motion for summary judgment as to the issue of damages.[9]  Under these circumstances, such a motion likely would have been denied because the court explicitly warned the parties in its September 25, 2020 Preliminary Pretrial Conference Order that:

---

[9] This court is aware that on May 18, 2021, Oak Leaf served Rule 45 subpoenas on two companies located in the Eastern District of Michigan, presumably to adduce damages evidence. *See* dkts. 65 and 77.  In response to the motion to quash and pursuant to Rule 45(d)(3), I deferred to the court in Michigan to sort this out, *see* dkts. 67 and 78; that's the last this court heard of it.

> Parties are to undertake discovery in a manner that allows them to make or respond to dispositive motions within the scheduled deadlines. The fact that the general discovery deadline cutoff . . . occurs after the deadlines for filing and briefing dispositive motions is not a ground for requesting an extension of the motion and briefing deadlines.

Dkt. 26 at 2.

As A&L/D'Acquisto argue, "[s]ummary judgment is the 'put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). "[A] party must submit evidence from which a reasonable trier of fact could find in its favor; it is not enough to simply allege that a material dispute exists." *Fleming Companies, Inc. v. Krist Oil Co.*, 324 F. Supp. 2d 933, 941 (W.D. Wis. 2004) ("It is not enough that defendant asserts that it will be able to show that the invoices are unreliable at trial; it must support this assertion with admissible evidence."); *see also Bordelon v. Board of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted") (citation omitted). *Cf. Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018)(at summary judgment, plaintiff's failure to show how she would prove damages on her contract claim constitutes waiver). Here, Oak Leaf's assertion that it will come forward with evidence of damages at trial is insufficient to survive summary judgment.

Because Oak Leaf has failed to present sufficient evidence of damages to support its breach of contract claim with respect to D'Acquisto's alleged use of the licensed mark prior to

termination of the license agreement, D'Acquisto is entitled to summary judgment with respect to that claim and will be dismissed as a counter-defendant.

## IV. Wolf Head Logo and Alpha Name

A&L has based its federal and state trademark infringement, unfair competition, and false designation of origin claims in part on Oak Leaf's use of the product name Alpha and the wolf head logo (Counts I-III) after termination of the license agreement.[10]  A&L generally contends that Oak Leaf's use of its registered wolf head logo and Alpha name violate A&L's rights in its registered and common law marks, falsely imply an association with A&L, and constitute unfair competition and false designation of origin.

As discussed above, to succeed on its claims, A&L must show that it has a protectable right in the asserted marks and that Oak Leaf's use of the marks is likely to cause confusion among consumers.  *CAE*, 267 F.3d at 673-74.  The determination whether a party has established protectable rights in a trademark is made on a case-by-case basis, considering the totality of the circumstances.  *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 665 (7th Cir. 2016); *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433 (7th Cir. 1999).  The party seeking to establish a trademark must show that it adopted the mark and "use[d it] in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of [the adopter of the mark]."  *Johnny Blastoff,*

---

[10] A&L/D'Acquisto assert in their brief in response to Oak Leaf/Weaver Enterprises' motion for summary judgment that "for the period of time when the License Agreement was in effect, Oak Leaf's use of the confusingly similar Lone Wolf head trademark was not objectionable (because during that period – Oak Leaf could use the LONE WOLF® mark), nor did D'Acquisto object.  D'Acquisto does not seek damages prior to termination."  Dkt. 71 at 11.

188 F.3d at 433-34. "The party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it." *Id.* at 434 (citing *Zazú Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503-04 (7th Cir. 1992)). "Use" may be demonstrated through a wide variety of sources, including "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications, as well as in media outlets such as television and radio." *Id.* Registration of a trademark establishes a rebuttable presumption of use as of the filing date. *S.C. Johnson*, 835 F.3d at 665 (quoting *Zazu Designs*, 979 F.2d at 504). "When the identifying word, term, name, symbol or device claimed as a trade name or mark is not registered . . ., the burden is on the claimant . . . to establish that it is entitled to protection under [the] Act." *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998).

Unlike Oak Leaf, A&L/D'Acquisto do not have a registration in either a wolf head logo or Alpha name mark. Citing only an affidavit submitted by D'Acquisto, A&L/D'Acquisto contend that D'Acquisto used a wolf head image and the Alpha name prior to 2006 in connection with the sale of hunting-related goods and that those marks "embody substantial goodwill and have achieved secondary meaning as identifiers, and are extremely valuable commercial assets and embody goodwill of incalculable value." *See* dkt. 46 at ¶¶ 5-7. A&L/D'Acquisto also have submitted an image of what appears to be an instructional DVD with the LONE WOLF® mark and a wolf's head. However, D'Acquisto's conclusory statements and a single image of the cover of an undated DVD do not constitute sufficient evidence from which a jury could reasonably conclude that A&L or D'Acquisto adopted the wolf head logo

and Alpha marks, used them in a sufficiently public way to identify or distinguish their goods, and acquired superior rights to the marks.[11]  *See Bordelon*, 811 F.3d at 989.

Accordingly, Oak Leaf/Weaver Enterprises are entitled to summary judgment on A&L's trademark claims related to the wolf head logo and Alpha name.


## V.  Weaver Enterprises as a Party

A&L has named Weaver Enterprises as a defendant with respect to each of its claims. However, it is undisputed that one month after executing the license agreement in 2006, Weaver Enterprises transferred all of its rights and obligations under the parties' agreements to Oak Leaf, and D'Acquisto approved the assignment in a Revised Memorandum of Understanding. Accordingly, Weaver Enterprises has not been a party to the license agreement since 2006.

A&L has not presented any evidence that Weaver Enterprises ever conducted any business using the marks or products at issue in this case.  However, in response to Oak Leaf/Weaver Enterprises's motion for summary judgment with respect to this issue, A&L/D'Acquisto assert a corporate veil piercing theory, arguing that Weaver Enterprises should be held liable as the parent corporation or alter ego of Oak Leaf.  In *Rasmussen v. Gen. Motors Corp.*, 2011 WI 52, 335 Wis. 2d 1, (2011), Chief Justice Abrahamson observed in her concurring opinion that

> Courts and commentators (as well as the parties and the amici in the present case, and the majority opinion) have articulated and purport to apply numerous tests to impute jurisdiction over the parent corporation based upon the acts of the subsidiary: The subsidiary is the parent's alter ego, agent, adjunct, creature,

---

[11] Because the court finds that A&L failed to prove the first element of its trademark claims, it is unnecessary to discuss the parties' arguments related to likelihood of confusion, laches, and release.

> dummy, tool, mere department, or instrumentality; the corporate veil should be 'pierced'; the parent exercises a high degree of day-to-day control over the subsidiary notwithstanding formal corporate separateness; and the enterprise theory based on economic integration of parent and subsidiary.

2011 WI 52 at ¶ 65 335 Wis. 2d at 36, (Abrahamson, C.J., concurring).

In support of their argument, A&L/D'Acquisto merely cite the above statement from the concurring opinion *Rasmussen* and point to the undisputed facts that: Jerry and Nancy Weaver and their family members are the only holders of Oak Leaf shares, Weaver testified that he "is Weaver Enterprises," Weaver Enterprises and Jerry Weaver arranged financing for Oak Leaf, Oak Leaf still owes money to Weaver Enterprises and Jerry Weaver, and Oak Leaf never paid for the 2006 assignment of the LONE WOLF® agreements.  However, A&L/D'Acquisto have not presented sufficient evidence from which a reasonable jury could conclude that Oak Leaf is a subsidiary corporation or alter ego of Weaver Enterprises.

In Wisconsin, the "instrumentality" or "alter ego" doctrine requires proof of the following elements:

> (1)  Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2)  Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

> (3)  The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Consumer's Co-op. of Walworth Cty. v. Olsen*, 142 Wis. 2d 465, 484, 419 N.W.2d 211, 217-18 (1988).

The facts cited by A&L/D'Acquisto do not establish that Weaver Enterprises had this level of control and domination over Oak Leaf.

Although only Jerry Weaver and his family members own shares in Oak Leaf, there is no evidence that Weaver Enterprises owns any shares in Oak Leaf, acts as a parent corporation, or dominates Oak Leaf's policy and business practices. A&L relies on Jerry Weaver's deposition testimony that "Weaver Enterprises is Jerry Weaver," but that vague and offhand comment says nothing about Oak Leaf or its relationship to Weaver Enterprises. As Oak Leaf/Weaver Enterprises argue, this evidence at most shows that Jerry Weaver is the sole owner of Weaver Enterprises and a partial owner of Oak Leaf.

A&L/D'Acquisto emphasize what they characterize as Oak Leaf's undercapitalization and financial dependency on Weaver Enterprises. However, the most that A&L/D'Acquisto have shown is that Oak Leaf never paid Weaver Enterprises for the assignment of the license agreement and has outstanding debts to Weaver Enterprises and Jerry and Nancy Weaver. In addition, "[w]hile significant, undercapitalization is not an independently sufficient ground to pierce the corporate veil. In order for the corporate veil to be pierced, in addition to undercapitalization, additional evidence of failure to follow corporate formalities or other evidence of pervasive control must be shown." *Consumer's Co-op*, 142 Wis. 2d at 482-83, 419 N.W.2d at 217. A&L/D'Acquisto have failed to make this showing.

Finally, A&L/D'Acquisto have failed to develop a meaningful argument, or cite any authority in support of their proclamation that Weaver Enterprises is an appropriate party in this case because it asserted claims against D'Acquisto in a 2013 lawsuit in state circuit court and was jointly liable to D'Acquisto for the settlement amount in that case.

Because A&L has failed to show that it may hold Weaver Enterprises liable for the trademark and breach of contract violations committed by Oak Leaf, Weaver Enterprises is entitled to summary judgment with respect to all of A&L's claims against it and will be dismissed as a defendant.

## ORDER

IT IS ORDERED that:

(1)    The motion for summary judgment filed by plaintiff A&L Industries, LLC and counter-defendant Andrae D'Acquisto (dkt. 43) is GRANTED in part and DENIED in part:

    (a)    The motion is GRANTED with respect to A&L's trademark and breach of contract claims against Oak Leaf for Oak Leaf's use of the LONE WOLF® mark after the termination of the license agreement on October 15, 2018.

    (b)    The motion is further GRANTED with respect to all of Oak Leaf's trademark, breach of contract, and IFDA counterclaims against A&L and D'Acquisto.

    (c)    The motion is DENIED in all other respects.

(2)    The motion for summary judgment filed by defendant Weaver Enterprises, Ltd. and defendant and counter-plaintiff Oak Leaf Outdoors, Inc. (dkt. 50) is GRANTED in part and DENIED in part:

    (a)    The motion is GRANTED with respect to A&L's trademark claims related to the wolf head logo and Alpha name.

    (b)    The motion is further GRANTED with respect to all of A&L's claims against Weaver Enterprises.

    (c)    The motion is DENIED in all other respects.

(3)     Defendant Weaver Enterprises and counter-defendant Andrae D'Acquisto are
        DISMISSED from this lawsuit.


Entered this 30th day of August, 2021.

                            BY THE COURT:

                            /s/
                            _____
                            STEPHEN L. CROCKER
                            Magistrate Judge